UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

|   |   |   |
|---|---|---|
| D'Pergo Custom Guitars, Inc., | ) | |
| Plaintiff, | ) | Civil Action No. 1:17-CV-000747-LM |
| v. | ) | |
| Sweetwater Sound, Inc., | ) | |
| Defendant. | ) | |

# DEFENDANT'S MEMORANDUM OF LAW
# IN SUPPORT OF ITS MOTION *IN LIMINE* TO EXCLUDE
# EXPERT TESTIMONY OF JEFFREY SEDLIK

In its Motion *in Limine* to Exclude Expert Testimony of Jeffrey Sedlik, Defendant, Sweetwater Sound, Inc. ("Sweetwater"), seeks to exclude the expert testimony of Jeffrey Sedlik on several distinct grounds. First, Sedlik's testimony is neither relevant nor reliable because it is based on an erroneous measure of damages which is contrary to law. Second, Sedlik's testimony is inadmissible under Rule 403 of the Federal Rules of Evidence because it raises a serious risk of undue prejudice and misleading the jury. Third, Sedlik's damages calculation based on "multipliers" is improperly punitive. Fourth, Sedlik's used inapposite comparators for establishing a reasonable licensing fee. Accordingly, Sweetwater's Motion *in Limine* to Exclude Expert Testimony of Jeffrey Sedlik should be granted.

## BACKGROUND

The Plaintiff, D'Pergo Custom Guitars, Inc. ("D'Pergo") seeks to admit the expert testimony of Jeffrey Sedlik ("Mr. Sedlik"), the President & CEO of the PLUS

Coalition, which bills itself as the "international standards body for the licensing of visual works." **Exhibit 1**, Report of J. Sedlik ("Sedlik Report"), at 1. In addition to his work for the PLUS Coalition, Mr. Sedlik is a self-described "professional photographer, educator, publisher, forensic analyst, graphic designer, product designer, expert witness, fundraiser, negotiator and consultant." *Id.*

On May 1, 2019, D'Pergo submitted a preliminary expert report of Mr. Sedlik, setting forth his opinion on D'Pergo's actual damages, under 17 U.S.C. § 504(b), resulting from Sweetwater's unauthorized use of a single photograph of guitar necks (the "Photo"), which appeared on Sweetwater's website. By its terms, the expert report purports to calculate actual damages by determining the hypothetical license fee that "a willing Defendant would have been reasonably required to pay to Plaintiff prior to each instance of use." *Id.* at 9. Mr. Sedlik arrived at this hypothetical license fee by selecting a "base actual damages" amount, and increasing that "base" amount in three distinct ways.

First, Mr. Sedlik surveyed as comparators only the most expensive form of licensing fees (rights-managed license fees). *Id.* at 21–24; **Exhibit 2**, Dep. Tr. of J. Sedlik ("Sedlik Dep.") at 188:16 – 188:22. Second, he applied a "scarcity multiplier" to the "base" damages, in order to account for his assertion that "scarce images typically demand significantly greater license fees than common images, often 3 to 5 times the fee for a common image." Exhibit 1, Sedlik Report, at 24 – 25. Finally, he applied a second "competitive use multiplier" to the already multiplied result, to account for his claim that licensees "would reasonably expect to pay . . . a

2

substantially greater fee" when purchasing the license from a competitor. *Id.* at 25–26. After applying a "5x scarcity multiplier" and a "10x competitive use multiplier" to the "base actual damages," based on rights-managed license fees, Mr. Sedlik arrived at a final figure of $1,583,450.00 in actual damages. *Id.* at 26.

## STANDARD OF REVIEW

Federal Rule of Evidence 702, as interpreted in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, "requires the trial judge to evaluate an expert's proposed testimony for both reliability and relevance prior to admitting it." *Ruiz-Troche v. Pepsi Cola of Puerto Rico Bottling Co.*, 161 F.3d 77, 80 (1st Cir. 1998) (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589–95 (1993)). Trial courts applying the *Daubert* standard must "act as a gatekeeper" to ensure that the "proffered expert testimony rests on a sufficiently trustworthy foundation." *United States v. Tavares*, 843 F.3d 1, 5 (1st Cir. 2016).

The *Daubert* Court enumerated several factors[1] for assessing the reliability of expert testimony, with a focus on the methodology an expert has chosen to employ; however, rather than comprising a "'definitive checklist or test,'" these factors "form the basis for a flexible inquiry into the overall reliability of a proffered expert's methodology." *Ruiz-Troche,*, 161 F.3d at 81 (quoting *Daubert*, 509 U.S. at 593).

Subsequently, the Court clarified that, although *Daubert* emphasized a review of an expert's methodology rather than her ultimate conclusions, "nothing in

---

[1] These factors include "the verifiability of the expert's theory or technique, the error rate inherent therein, whether the theory or technique has been published and/or subjected to peer review, and its level of acceptance within the scientific community." *Ruiz-Troche*, 161 F.3d at 77 (citing *Daubert*, 509 U.S. at 593–95).

either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Thus, "[a] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered," and exclude an expert's testimony on that basis. *Id.*

In addition to the reliability requirement, the *Daubert* Court "imposed a special relevancy requirement" under Rule 702: "To be admissible, expert testimony must be relevant not only in the sense that all evidence must be relevant but also in the incremental sense that the expert's proposed opinion, if admitted, likely would assist the trier of fact to understand or determine a fact in issue." *Ruiz-Troche*, 161 F.3d at 81 (internal citation omitted). This "special relevancy" requirement is sometimes described as the need for a "fit" between the testimony and the relevant issues in the case. *See, e.g., Daubert*, 509 U.S. at 591. The fit requirement exists to address "the problem that arises when an expert's methods, though impeccable, yield results that bear a dubious relationship to the questions on which he proposes to opine." *Samaan v. St. Joseph Hosp.*, 670 F.3d 21, 32 (1st Cir. 2012). It applies not only to the factual issues on which an expert opines but also to the underlying legal claims that such testimony purports to bolster. *See, e.g., Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 572–73 (S.D.N.Y. 2007) (excluding expert report for, *inter alia*, "lack of fit between the basic premise of the study . . . and [plaintiff's] oft-expressed position in this litigation").

Finally, in addition to—and, at times, working in conjunction with—the reliability and relevancy requirements of Rule 702, under Rule 403 the probative value of expert testimony must not be substantially outweighed by, among other things, "the danger of unfair prejudice, confusion of the issues, or misleading the jury." Fed. R. Evid. 403; see *Ruiz-Troche*, 161 F.3d at 81–82 & n.3; *Tuli v. Brigham & Women's Hospital, Inc.*, 592 F. Supp. 2d 208, 211–213 (D. Mass. 2009) (excluding expert testimony under Rules 702 and 403). In particular, the *Tuli* Court noted that the proffered expert testimony was improper under both rules where it "amount[ed] to nothing more than well-credentialed physicians saying: Take my word for it" and "resonate[d] as a lawyer's closing argument." *Id.*

## ARGUMENT

### I. Mr. Sedlik's testimony is neither relevant nor reliable because it is based upon a legally improper measure of damages.

Mr. Sedlik's testimony must be excluded because it rests upon a misstatement of the applicable law. "Expert opinions that are contrary to law are inadmissible." *Loeffel Steel Prods., Inc. v. Delta Brands, Inc.,* 387 F. Supp. 2d 794, 806 (N.D. Ill. 2005). Federal appellate courts and courts within the First Circuit have excluded such opinions under both prongs of Rule 702 when they "cannot be said to be scientific, to be reliable, or to be helpful to the trier of fact." *Id.*; see, e.g., *United States v. Cunningham*, 679 F.3d 355, 379–81 (6th Cir. 2012); *Hebert v. Lisle Corp.*, 99 F.3d 1109, 1117 (Fed. Cir. 1996); *Cave v. Saxon Mortg. Servs., Inc.*, No. 11-4586, 2015 WL 6153754, at *9 (E.D. Pa. Oct. 20, 2015) (collecting cases); *Rhode Island Comm'n for Human Rights v. Graul*, 120 F. Supp. 3d 110, 127 & n.26 (D.R.I.

5

2015); *Keppler v. RBS Citizens N.A.*, No. CIV. 12-10768-FDS, 2014 WL 2892352, at *9–10 (D. Mass. June 24, 2014). As the Federal Circuit observed, "[w]e encourage exercise of the trial court's gatekeeper authority when parties proffer, through purported experts, not only unproven science but markedly incorrect law." *Hebert*, 99 F.3d at 1117 (internal citation omitted).

The standard at issue here is the proper measure of actual damages under Section 504(b). Courts allow copyright plaintiffs to rely on evidence of the value of a hypothetical licensing fee as a measure of actual damages. *See, e.g., On Davis v. The Gap, Inc.*, 246 F.3d 152, 160-61 (2d Cir. 2001); *Rivera v. Méndez & Compañia*, 988 F. Supp. 2d 174, 178-79 (D.P.R. 2013). When determining the value of the hypothetical license, the proper focus is on the hypothetical "result of negotiation between a willing buyer and a willing seller." *Country Rd. Music, Inc. v. MP3.com, Inc.*, 279 F. Supp. 2d 325, 331 (S.D.N.Y. 2003) (internal quotations omitted)); *see also On Davis*, 246 F.3d at 167; *Real View, LLC. v. 20-20 Techs., Inc.*, 811 F. Supp. 2d 553, 557 (D. Mass. 2011). Critically, this inquiry "does not focus on the subjective willingness or valuations of the parties, but rather the objective fair market value of the use." *Rivera v. Mendez & Compañia*, 988 F. Supp. 2d at 178; *see also Country Rd.*, 279 F. Supp. 2d at 331 (explaining that instead of asking "'what MP3.com would have had to pay to the [p]laintiffs as a license fee in order to obtain permission to use their compositions on the My.MP3.com service'… the proper inquiry was what price 'a willing buyer and a willing seller' would have agreed on for the actual use made by the defendant.").

Mr. Sedlik's testimony purports to "[a]ssume that actual damages . . . are to be determined in part by the fee/s [*sic*] that a willing Defendant would have been reasonably required to pay Plaintiff." Exhibit 1, Sedlik Report, at 9. At his deposition, Mr. Sedlik clarified that this phrase, as written, was intended to be synonymous with "willing buyer and seller." Exhibit 2, Sedlik Dep., at 158:17 – 158:19. Yet, contrary to his own professed methodology (and the applicable legal standard), Mr. Sedlik acknowledged that, in fact, he calculated damages by "look[ing] at the parties that are actually involved." *Id.* at 160:1 – 160:9. When pressed regarding whether, under his own methodology, he should consider the price that a hypothetical willing buyer (rather than Sweetwater) would have paid, Mr. Sedlik demurred, ultimately responding, "It's not a yes or no. Therefore, I am telling you what I feel is equitable." *Id.* at 217:16 – 217:17.

Mr. Sedlik further implicitly acknowledged that his approach to determining fair market value was incorrect. "Would the identity of the parties, if known at the time of the transaction, make a difference in the license transaction?" he posited. *Id.* at 161:12 – 161:19. "[I]n my opinion, you have to consider that. The IRS might say otherwise when they are figuring how much tax somebody owes on their assets." *Id.* Mr. Sedlik deviated from the "objective fair market value" legal standard when he took into account the actual identity of the parties rather than considering a willing buyer and willing seller. *Rivera*, 988 F. Supp. 2d at 178. In so doing, he undermined both the relevancy and the reliability of his entire damages assessment—which, again, purported to apply an objective standard.

7

Mr. Sedlik's testimony compounds his initial error by increasing his hypothetical licensing fee beyond the "base" fee for an image in three ways. First, the report calculates "base actual damages" based on comparative license fees. Exhibit 1, Sedlik Report, at 21–24. Mr. Sedlik testified that he selected the most expensive form of licensing (a rights-managed license) for this figure, not based on any objective inquiry, but merely because Sweetwater "chose" that license when it used D'Pergo's image, rather than selecting a cheaper license from a stock photo agency. Exhibit 2, Sedlik Dep., at 188:16 – 188:22. Mr. Sedlik refused to consider whether a willing buyer would have "chosen" a less expensive license, and insisted on looking only to Sweetwater's "decision." *Id.* As he explained: "The fact that they used their competitor's image and did not go to a stock agency" meant that he "ha[d] to use a rights-managed" license. *Id.* at 199:4 – 199:13. This subjective approach violates the appropriate legal standard—and, with it, the report's own, purportedly objective, approach.

Second, the report applies a "scarcity multiplier" to the "base" damages, further compounding the legal error. Exhibit 1, Sedlik Report, at 24–25. Although Mr. Sedlik claimed he did not consider the actual parties when applying this multiplier, *see* Exhibit 2, Sedlik Dep., at 163:4, he acknowledged that his assumptions regarding scarcity were "sufficiently proven by Sweetwater's own selection of that particular image which they had to go steal from a website instead of going to a stock agency and just selecting any image that shows guitars and/or necks." *Id.* at 180:1 – 180:20. And, in the report itself, Mr. Sedlik states,

8

summarily, that the scarcity of the infringed image (justifying the "scarcity multiplier" to damages) "is evidenced by Defendant's selection and exploitation of the Photograph." Exhibit 1, Sedlik Report, at 24. In other words, the image is only scarce in the sense that he assumes Sweetwater needed exactly *that image* and not a substitute because Sweetwater happened to "choose" that image. If Sweetwater is removed from this equation, the alleged scarcity of the image evaporates because Mr. Sedlik identifies no other party who ever licensed this image for anything. Indeed, even D'Pergo stopped using the image in 2007. **Exhibit 3**, Dep. Tr. of S. Dapergolas Vol. I ("Dapergolas Dep. Vol. I"), at 216:2 – 216:8. Thus, once again Mr. Sedlik violates even his own methodology (and the appropriate legal standard) by basing his damages calculation on what Sweetwater "did," rather than on what a hypothetical "willing buyer" *would* do if it were purchasing a license.

Finally, the report applies a "competitive use multiplier" to the already multiplied damages. Exhibit 1, Sedlik Report, at 25–26. Here, Mr. Sedlik considered the fact that the actual parties were competitors, and therefore determined that the rates would "shoot up" (thereby justifying yet another "multiplier"). Exhibit 2, Sedlik Dep., at 163:13 – 163:16. He explained: "I am assuming that Sweetwater would have sat across the table from D'Pergo and said, 'We want to use this photograph from your website. How much?'" *Id.* at 164:1 – 164:4. Mr. Sedlik emphasized that Sweetwater "did get the image from D'Pergo" and that, therefore, his "calculations assume that Sweetwater went to D'Pergo." *Id.* at 164:8 – 164:12. He did not even attempt to mask the fact that this calculation

9

violated any norms of objectivity, testifying that, "when you are calculating actual damages, if the identity of the parties would affect the transaction at the negotiations table, then you have to consider it. And to that extent, are they competitors or not?" *Id.* at 160:10 – 160:14. Like his other calculations, the use of the "competitive use multiplier" violates the objective legal standard.

Each of these calculations fail to follow the "willing buyer and willing seller," fair-market-value methodology approved by the courts for determining Section 504(b) damages. *See, e.g., On Davis*, 246 F.3d at 160-61; *Rivera*, 988 F. Supp. 2d at 178-79. Because the "multipliers" build off the erroneous assumptions in the "base" damages, while introducing their own methodological errors, the misstatement of law at the center of the damages calculation is compounded, until an astronomical damages figure is reached. In fact, at his deposition Mr. Sedlik hesitated to state that his own damages figure—$1.58 million—reflected the value of the license, presumably because it was so high. Exhibit 2, Sedlik Dep., at 201:8 – 203:21. Because each of Mr. Sedlik's calculations is "based on an erroneous legal premise," his entire testimony must be excluded. *Southard v. United Reg'l Health Care Sys., Inc.*, No. 7-06-CV-11-L, 2008 WL 4489692, at *2 (N.D. Tex. Aug. 5, 2008); *see also Cunningham*, 679 F.3d at 379–81 (upholding exclusion of entire expert report, where, after removing "numerous misstatements of the law," the expert was "left with nothing useful to tell the jury").

In *United States v. Orr*, the Tenth Circuit excluded expert testimony on the fair market value of a patent as unreliable under Rule 702, for similar reasons. *Orr*

10

is instructive because patent licenses are calculated using the same standard: "the value of the patent . . . is what a willing buyer would pay a willing seller." *United States v. Orr*, 692 F.3d 1079, 1093 (10th Cir. 2012). Yet, rather than survey the market to determine this value, the expert "merely assumed 'the fact that this patent exists indicates that there is no other patent that exists that talks about this group of [fuel] compositions.'" *Id.* at 1093. This is analogous to Mr. Sedlik's repeated insistence that the mere fact of the infringement indicated scarcity, and compelled using the most expensive type of license for comparison.

The expert in *Orr* also assumed that a particular buyer (who was at the center of the criminal charges against Orr) would have purchased the patent, looking only at "an arm's length negotiation between the holder of the patent as licensor and the licensee" without "factor[ing] that these negotiations for a license may include more than one licensee or how that would affect the royalty value of the patent." *Id.* at 1902. This too is analogous to Mr. Sedlik's refusal to consider an alternative where a willing buyer would have chosen to purchase a similar image from a non-competitor. Thus, in *Orr*, the expert looked only at the actual "parties" to a hypothetical patent sale that was pitched to investors, without using the accepted method of calculating a hypothetical license's value based upon a "willing buyer and willing seller." By excluding the expert testimony, the Tenth Circuit held that the district court properly "fulfilled its duty as gatekeeper." *Id.* at 1093.

For these reasons, Mr. Sedlik's testimony must be excluded in its entirety. Each of the elements of his damages calculation is premised upon faulty

assumptions that reflect not only a fundamental misunderstanding of the relevant measure of damages under Rule 504(b), but also Mr. Sedlik's own self-professed methodology. The report is therefore irrelevant to the determination of Section 504(b) damages, and it is *per se* unreliable.

II. **Any testimony that survives a Rule 702 analysis must be excluded under Rule 403 as unduly prejudicial and misleading.**

To the extent any of Mr. Sedlik's testimony survives either prong of Rule 702, it must be excluded under Rule 403 because it raises a serious risk of creating undue prejudice and misleading the jury. *See, e.g., Malletier*, 525 F. Supp. 2d at 573 (Holding, that, in light of numerous flaws in expert's study including a lack of "fit" with substantive law, "the probative value is substantially outweighed by the prejudicial effect and the serious potential to mislead the jury."); *Southard*, 2008 WL 4489692, at *2 (Excluding testimony "based on an erroneous legal premise" under Rules 702 and 403). Exclusion under Rule 403 serves to protect the jury from being misled by expert testimony that is methodologically unsound, legally incorrect, and, above all, not trustworthy. In sum, its exclusion "fulfills [this Court's] duty as gatekeeper." *Orr*, 692 F.3d at 1093.

III. **Mr. Sedlik's damages calculation based on "multipliers" is improperly punitive.**

Mr. Sedlik's damages calculation must also be excluded, under Rule 702, as improperly punitive because it relies upon arbitrary "multipliers." Federal district courts that have considered this precise issue in copyright infringement cases have concluded that "'actual damages' do not include multipliers for unauthorized use,

which courts have deemed impermissible penalties akin to punitive damages, which are not recoverable under § 504(b) of the Copyright Act." *Grant Heilman Photography, Inc. v. McGraw-Hill Companies*, 115 F. Supp. 3d 518, 526–27 (E.D. Pa. 2015) (collecting cases).[2] Mr. Sedlik's use of multipliers, which he ties, with little support, to industry practices, is equally inadmissible on that basis. *See Faulkner v. Nat'l Geographic Soc.*, 576 F. Supp. 2d 609, 617–18 (S.D.N.Y. 2008).

In fact, in prior testimony contradicting his testimony here, Mr. Sedlik demonstrated that he agrees with this principle. He has previously testified that "[m]ultipliers are not used to determine the fair market value of a license at the time infringement occurs." *Straus v. DVC Worldwide, Inc.*, 484 F. Supp. 2d 620, 649 (S.D. Tex. 2007). The Southern District of Texas credited Sedlik's statement in granting summary judgment for the defendant, dismissing the plaintiff's claim for a multiplier of actual damages.[3] Here, Mr. Sedlik apparently wants to tell a jury the opposite: that multipliers *must* be used to determine fair market value.

---

[2] The District of Massachusetts, while noting that copyright law "disfavors penalties," once permitted the use of multipliers where *both* parties' experts agreed on their usage. That decision, however, was vacated in part by the First Circuit. *Bruce v. Weekly World News, Inc.*, 150 F. Supp. 2d 313, 321 & n.14 (D. Mass. 2001), *aff'd in part, vacated in part*, 310 F.3d 25 (1st Cir. 2002).

[3] In *Leonard v. Stemtech Int'l Inc*, 834 F.3d 376 (3d Cir. 2016), the Third Circuit declined to hold that the trial court abused its discretion in permitting Mr. Sedlik to use multipliers to determine fair market value. *Id.* at 393. Unlike this case, however, "Stemtech never challenged either [multiplier] in its *Daubert* motion," and it did not cross-examine Sedlik at trial on this topic…." *Id.* at 392 n.13. "Since Stemtech presented no evidence or methodology to cast doubt on the use of multipliers to account for factors relevant to a final fair market value, neither the District Court nor the jury had any basis to discount this aspect of Sedlik's testimony." *Id.* at 393-94.

13

In this case, Mr. Sedlik's deposition testimony reveals that, while he presented multipliers in an alleged effort to capture market realities, in actuality he applied them to prevent what he viewed as an "inequitable" result. For example, when asked whether party-specific multipliers were inappropriate if the result did not reflect the fair market value of the hypothetical license, he responded: "I think the opposite of that is entirely inequitable and would – why wouldn't everybody just . . . go steal all your competitor's images and put it on your site and then pay 37 cents because there's royalty-free images available for 37 cents?" Exhibit 2, Sedlik Dep., at 200:20 – 201:2.

This response encapsulates both reasons courts have rejected the use of multipliers in similar cases: (1) they are punitive (in Mr. Sedlik's words, *not* using them would be "inequitable"); and (2) they do not reflect the fair market value of a hypothetical licensing fee. As Mr. Sedlik acknowledged, the fair market value of the license may be much lower. As the Southern District of New York observed, "[t]he 'value of what was illegally taken' is not determined by multiplying it." *Stehrenberger v. R.J. Reynolds Tobacco Holdings, Inc.*, 335 F. Supp. 2d 466, 469 (S.D.N.Y. 2004) (quoting *On Davis*, 246 F.3d at 172). Ultimately, Mr. Sedlik appeared to agree that "you should [not] under actual damages pay a penalty for the fact that you infringed." Exhibit 2, Sedlik Dep., at 201:2 – 201:7.

Regardless of Mr. Sedlik's rationale for "multiplying" the fair market value of a hypothetical license fee, such "multipliers" are impermissibly punitive, and

14

therefore inadmissible under Rule 702. Accordingly, Mr. Sedlik's damages calculation based on "multipliers" also must be excluded on this basis.

### IV. Mr. Sedlik used inappropriate comparators in calculating his "base" license fee.

Mr. Sedlik used rights-managed license to determine his "base" fee even though such licenses are typically the province of the professional photographer, Exhibit 1, Sedlik Report, at 14, and the Photo was taken by an amateur, Exhibit 3, Dapergolas Dep. Vol. I, at 10:5 – 10:6. "[O]ther courts have recognized the error of beginning with a benchmark license for a use different from that made by the infringer." *Country Rd.*, 279 F. Supp. 2d at 331 (citing cases). Moreover, courts have excluded expert opinions on photograph licenses for similar reasons. *See Baker v. Urban Outfitters, Inc.*, 254 F.Supp.2d 346, 354 (S.D.N.Y. 2003) (rejecting expert testimony based on commissioned photography where defendant infringed a stock photograph); *see also Dash v. Mayweather*, 731 F.3d 303, 319 (4th Cir. 2013) (concluding evidence of license fees paid to relatively more establish artists is "too speculative"). Mr. Sedlik's reliance on rights-managed licenses that, by his own words, are typically the province of professional photographers, renders his base license fee calculate inadmissible here.

### CONCLUSION

The Court should exclude the expert testimony of Mr. Sedlik for the foregoing reasons.

Dated: August 1, 2019

        Respectfully submitted,

        Attorneys for Defendant,
        SWEETWATER SOUND, INC.


        Bernstein, Shur, Sawyer & Nelson, P.A.

        */s/ Edward J. Sackman*
        Edward J. Sackman, Bar No. 19586
        Richard C. Gagliuso, Bar No. 874
        Matthew J. Saldaña, Bar No. 271806
        670 N. Commercial Street, Suite 108
        P.O. Box 1120
        Manchester, New Hampshire 03105
        (603) 623-8700
        nsackman@bernsteinshur.com
        rgagliuso@bernsteinshur.com
        msaldana@bernsteinshur.com