# Exhibit 2

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW HAMPSHIRE

```
* * * * * * * * * * * * * * * *
                               *
D'PERGO CUSTOM GUITARS         *
                               * Civil Action No.:
vs.                            * 1:17-CV-0000747-LM
                               *
SWEETWATER SOUND               *
                               *
* * * * * * * * * * * * * * * *
```

### DEPOSITION OF PROFESSOR JEFFREY SEDLIK

Deposition taken at the law offices of Lambert, Shortell & Connaughton, 92 State Street, Boston, Massachusetts, on Wednesday, June 19, 2019, commencing at 10:20 A.M.


**Court Reporter:**
Tina L. Hayes, LCR, RPR
NH Licensed Court Reporter No. 80
(RSA 310-A:161-181)

157

1  Q. Right. And so there is no license fee if
2  there is no liability. And what you are here to do
3  is help us understand, if there is liability, here's
4  what we ought to be thinking about in determining
5  damages?
6  A. Yes. Exactly right.
7  Q. Okay.
8  A. And there is that last part that says
9  "during the period." And I am not determining the
10 period, and I did not go in and validate it. You
11 asked a question earlier about, well, yes, you did
12 go in and validate it because I went and looked at
13 the website and archive.org --
14 Q. That's right. That's what I was trying to
15 determine: What did you assume and what did you
16 validate?
17 A. I visited archive.org. It's a tool that
18 many people use and I have used in the past when I
19 am asked to validate things. And I could see that
20 it was in use on certain dates, according to that
21 record. But that was not an essential component of
22 my work, and I wasn't asked to do that.
23        You could say I did it out of my own

158

1  curiosity, but my opinions are not based on that.
2  My opinions are based on this assumption. And if
3  you folks, through your argumentation, come up with
4  that it started on, you know, August 5 of 2005, then
5  I am going -- and I am told to recalculate damages
6  or that certain usages never happened, change the
7  assumption -- my retained counsel changes the
8  assumption, I recalculate the damages.
9  Q. Understood. Thank you.
10        Let's go to the next paragraph,
11 paragraph D: "Assume that actual damages in this
12 matter are to be determined, in part, by the fees
13 that a willing defendant would have been reasonably
14 required to pay to plaintiff prior to each instance
15 of use."
16        Do you see that?
17 A. I do. And I should say that the words
18 "plaintiff" and "defendant," that was handed to me.
19 But it's just a willing buyer and seller. Okay. We
20 could replace that, say there was no litigation.
21        So the -- this assumption did not drive me
22 to assume that my example had to contemplate
23 infringement is what I am trying to say or that

159

1  there was any litigation involved.
2  Q. Now, did this assumption drive you to make
3  opinions or form opinions on the idea that the fee
4  would have been negotiated between Sweetwater and
5  D'Pergo?
6  A. I want to give you an accurate answer; so
7  I am thinking about it for a minute.
8  Q. Take your time.
9  A. So as you have seen, there are multipliers
10 in my report. There's two parts to the damages
11 estimation or calculations and one part is coming up
12 with a market value based on average offering for an
13 image offered under a licensing model that's
14 equivalent to what people actually use when two
15 parties other than stock agencies are transacting
16 business.
17        And because I don't have real world
18 licensing data from Sweetwater or from D'Pergo, I
19 had to go to the stock agencies to get my pricing
20 points. But -- and so in doing so, that base value
21 of the base license fees does not assume that it was
22 D'Pergo's image or that Sweetwater used it. So
23 that's the first part of my answer to your question.

160

1        But to provide you with a full answer, I
2  have to say that the second part of the calculation
3  looks at the parties that are actually involved
4  because if, for example, Guitar Center called Chuck
5  Surack and said, "Hey, we want to use all of the
6  photographs in your website on our website. We're
7  going to make our website look exactly like your
8  website. We want all the photos. What would you
9  charge?"
10        And so there's an example of why, when you
11 are calculating actual damages, if the identity of
12 the parties would affect the transaction at the
13 negotiations table, then you have to consider it.
14 And to that extent, are they competitors or not? A
15 competitor is going to pay more than a noncompetitor
16 for a licensed image.
17        Can that similar image be found elsewhere?
18 That's not necessarily contemplating who took the
19 image. I can think of a few circumstances where it
20 would. But, in general, that's irrelevant. It's
21 just about the image itself. So that's the two
22 caveats I had to explain.
23 Q. So the second caveat, would that be the --

1  what you called -- I am going to try to use your
2  term here so I understand it -- the actual damages
3  multiplier for competitive use?
4      A.   That's the -- I guess you have this one
5  side that's just your -- what does it cost to
6  license an image out there, a generic image? Let's
7  get some price samples from the rights model that
8  would have applied, in my opinion, and then average
9  them so that we come up with a fair number. And
10 that's just for a generic image.
11          And then the other part of that is now is
12 it a scarce image or not? And then the other part
13 is what you just asked, which is does the identity
14 of the parties make -- would the identity of the
15 parties, if known at the time of the transaction,
16 make a difference in the license transaction? And,
17 in my opinion, you have to consider that. The IRS
18 might say otherwise when they are figuring how much
19 tax somebody owes on their assets. But in the
20 licensing world, you have to consider whether it's a
21 competitive use or not.
22     Q.   Okay. So there's the piece where you have
23 looked at photographs from the licensing agencies.

1  And you have provided us some examples of that, and
2  that's part of your analysis; correct?
3      A.   Correct. And I should say that, given
4  more time and more budget, that I would go out to
5  photographers and query them. I spend a lot of time
6  talking to photographers about their licensing
7  practices and pricing and things like this, and I
8  don't know anybody else that does. But for
9  expediency and because it is a relatively accurate
10 measure, averaging three stock agencies' pricing is
11 how I approached this project.
12     Q.   And so the stock agency pricing average
13 piece of this does not assume that it's a D'Pergo
14 photo or that Sweetwater used it. Am I
15 understanding that correctly?
16     A.   Correct.
17     Q.   Okay. But then you explained a little
18 farther. And what you said is you have also added
19 in two concepts that you believe are important to
20 capture the fee here. The first is scarcity;
21 correct?
22     A.   Correct.
23     Q.   And in the scarcity component of your

1  analysis -- and we'll get to competitive. But for
2  scarcity, are you factoring in the identity of the
3  parties involved?
4      A.   Not in this case. But I did mention in
5  that long-flowing answer that there are
6  circumstances under which I would.
7      Q.   Possible you might, but you didn't in this
8  case?
9      A.   I did not.
10     Q.   Got it.
11          And then in the competitive component, you
12 are considering the particular parties in this case?
13     A.   Yes, because it most definitely would come
14 into play when a licensor knows that the licensee or
15 potential licensee is going to use the image in a
16 competitive way. The rates would shoot up.
17     Q.   Okay.
18     A.   You would reasonably require more money
19 from the licensee to use it in a way that competes
20 with your own business efforts.
21     Q.   And haven't you also assumed there that
22 Sweetwater would have gone to a competitor for the
23 photograph?

1      A.   No. I am assuming that Sweetwater would
2  have sat across the table from D'Pergo and said, "We
3  want to use this photograph from your website. How
4  much?"
5      Q.   Right. And you are assuming they would
6  have gone to D'Pergo and not gone to some other
7  source for that photograph?
8      A.   I think, because they did get the image
9  from D'Pergo and the identity of those two entities
10 is -- would be important and relevant in any
11 licensing transaction, that, yes, I -- my
12 calculations assume that Sweetwater went to D'Pergo.
13 But it would be a very similar calculation if
14 Sweetwater went to Guitar Center and said, "We
15 want" -- now I get your question. I am sorry.
16          You know, it would be the same, I believe,
17 for other competitors. And, you know, companies
18 compete in different ways. And I understand the
19 nature. And I am not going to testify on it, but I
20 understand about boutique guitars and all the
21 discussion that's gone on about that. But there is
22 some level of competition between the entities. The
23 scope of that, I not going to testify about. But

1  of the subject matter because that pricing is going
2  to be the same if that's a picture of something else
3  at the stock agencies. I mean, they are a commodity
4  business, and so there is a measure of quality
5  affecting price. And it's certainly in place in the
6  whole industry.
7        But if I put a picture of a potato in
8  there, we would be sitting here at this table and
9  you would be saying, "Are you serious? You have a
10 picture of a potato in here." And I would have to
11 try to explain to you why it's a beautiful picture
12 of a potato and that the price for that potato
13 picture is based on, you know, the stock industry's
14 notion of demand for images. It falls into a class
15 of images that are priced the same level.
16   Q.  So just to be clear, your testimony is
17 that the content of the pictures you picked as
18 comparative pictures in Exhibit D is not important
19 to determining an accurate average stock price?
20   A.  It can be, but it's not in this case. If
21 that was a picture of -- there are certain levels of
22 photography that are in tiered pricing structures at
23 the stock agencies where some are more or less

1  expensive than others. And there's editorial
2  photography where it's a picture of somebody playing
3  tennis at Wimbledon or some news event. And,
4  certainly, if you go over there, the assumption is
5  that you are using that -- those images editorially
6  for news-reporting purposes. They have their own
7  set of prices, and it says "no commercial use" and
8  all of that.
9        But on the commercial side, I could have
10 picked some of their other images of a similar
11 quality from within the same stock agency, and it
12 would -- and they would be priced at the same rate.
13   Q.  So going back to page 9 and your
14 assumptions and the discussion we were having about
15 scarcity, you applied a scarcity multiplier in this
16 case; correct?
17   A.  Yeah.
18   Q.  And that multiplier is based on -- the
19 thing it multiplies is the cost of the images in
20 Exhibit D; right? The average cost?
21   A.  The cost of a generic photograph that is a
22 rights-managed image that is of a quality -- it's a
23 quality rights-managed image of a similar quality to

1  the quality of the image in question.
2    Q.  And, again, you have assumed that scarcity
3  applies here because you have assumed that
4  Sweetwater needed exactly the photo that
5  Mr. Dapergolas took?
6    A.  You know, there might be some level of
7  scarcity associated with the pricing, even at the
8  base level. An example would be there's a lot of
9  stock photographs with two hands shaking or one hand
10 holding a pen or, you know, those types of common --
11 what you would think of as your typical stock
12 images. And then you get into pictures like -- even
13 in my examples where it's a nicely staged image.
14 And it could be of a guitar or something else
15 photographed with careful attention to lighting,
16 composition, color, line, everything, and they price
17 it accordingly.
18       So I had to get into the same ballpark as
19 the image that was allegedly infringed, and I did
20 so. I chose guitar images because guitar images are
21 not priced differently than trombone images or, you
22 know, other -- most other subject matter except for
23 very common subject matter.

1        And then, yes, for the scarcity
2  multiplier, it's based on the assumption that few
3  images were available that would have been suitable.
4  And that's proven by -- let's say, sufficiently
5  proven by Sweetwater's own selection of that
6  particular image which they had to go steal from a
7  website instead of going to a stock agency and just
8  selecting any image that shows guitars and/or necks.
9        So what drove them to pick that image and
10 that image only and to use that image and that image
11 only on their site and to go so far as not even
12 licensing it when they could go get another image?
13 Why did they want that image? Well, did they know
14 that any of their competitors could be using any
15 royalty-free images out there or were those images
16 not of sufficient quality? You know, who knows if
17 Guitar Center is using the same royalty-free image
18 that Sweetwater is using? And so they made a choice
19 that got them near-exclusive usage of a photograph,
20 you know, that served their purpose.
21   Q.  I know from your report that you have been
22 on the Electric Guitar Buying Guide as it's shown on
23 the Wayback Machine; right?

1  A.  So what you are talking about there in
2  industry parlance would be called placement.  So
3  whether at -- you know, you have the level of
4  website home page, which is more expensive than
5  website internal page.  There's no further
6  breakdown.  So you have a hundred pages.  You have a
7  thousand pages.  You have a hundred million pages.
8  The price for secondary placement on a website is
9  going to be the same.
10       If you have many buying guides or one
11  buying guide, it's going to be the same.  But I
12  would admit that whoever is handling profits would
13  need to consider just all the factors that go into
14  the sales.
15  Q.  And do your opinions on licensing take
16  into account that the image did not appear on the
17  home page?
18  A.  Yes.  I did account for multiple
19  placements.  And what "multiple placements" means is
20  does it show up or will it be used on more than one
21  URL?
22  Q.  And when you say you accounted for
23  multiple placements, can you be a little more

1  that there were two placements of the image?
2  A.  It appeared on two URLs.
3  Q.  And so that is going back to page 8 at the
4  very bottom there as subparagraphs to Assumption A.
5  You have two URLs there.  Is that what you are
6  referring to?
7  A.  Right.  I wasn't suggesting that there
8  were two copies of the image.  I was suggesting that
9  the image was displayed on two different URLs.
10  Q.  Now I would like you to assume for
11  purposes of this question that these two URLs
12  represent simply an update/reorganization of the
13  website; some changing to the font, some other
14  things, but content wasn't changed.  Now, with those
15  assumptions, in your view, does that still count as
16  two URLs?
17  A.  In my view in terms of license practice,
18  if I didn't have that assumption, that it was on two
19  URLs, I would not select multiple placement if they
20  were not on two different URLs at the same time.  If
21  there was overlap for even one day, then I -- then
22  that would be a certain license period that would
23  apply to the secondary placement.  But if there was

186

1  specific?
2  A.  There's an option when you are licensing.
3  It affects the license marginally, the pricing.  If
4  I have a website -- companies have large quantities
5  of pages on their website for several reasons.  And
6  two of those reasons are, one, you need to be able
7  to display all your products and, two, you want to
8  be found when people search search engines.  So it's
9  search engine optimization; many, many pages with
10  dynamic content that loads are based on searches.
11  It gets you up in the search rankings, brings in
12  more customers.  So you want to have a lot of text,
13  a lot of images, a lot of pages.  And then you
14  want -- I am just not going down that -- keep going
15  down that path because it's not really the scope of
16  my testimony.  But you asked the question.
17       So I will say that the -- the pricing
18  would be affected by whether it is a home page or
19  not.  And then if it's not a home page, are there
20  multiple placements of the image?  And whether
21  there's 2 placements or 10 placements, it tends, in
22  most right-managed licensing, to be the same.
23  Q.  Now, in this case, is it your position

188

1  no overlap, then that's a situation where, if that
2  was proven and I was directed to rely on a new
3  assumption that there was only one placement, I
4  mean, I would adjust my calculations.
5  Q.  Now, going back to Assumption F, which is
6  on the following page, page 9 -- we have been
7  talking about this.  And the thing that I want to
8  ask you about is you mentioned at the beginning of
9  the discussion that you did some searching for
10  comparable images that were available for a
11  rights-managed license; correct?
12  A.  Yes.
13  Q.  Okay.  Why did you choose only
14  rights-managed licenses?  Why didn't you consider
15  other kinds of licenses?
16  A.  For the reasons described earlier in my
17  testimony, if Sweetwater chose not to go to a stock
18  photo agency to license an image of guitars or
19  necks -- and they made that decision.  Nobody else
20  made that decision.  They went to a corporation and
21  chose an image from their site.  They happened not
22  to license it.  But when they made that decision,
23  they didn't -- you know, corporations and

197

1   Q.   And why is it reasonable to assume that
2   Sweetwater would have been paid that instead of just
3   going to a stock agency?
4   A.   So yesterday -- I bought this tie
5   yesterday across the street.  And you had to buy
6   three ties, and you got 50 percent off if you buy
7   three ties.  And if I just took the ties and put
8   them in my pocket and walked out and got caught,
9   what are their damages?  Is it for the $50 off on
10  the three ties?  I chose not to buy the ties.  I
11  chose to walk into Brooks Brothers where they are
12  expensive.  You know, I stole the ties.  Do I
13  deserve the discount price?  I don't follow the
14  logic.
15  Q.   We're trying to figure out a hypothetical,
16  willing buyer/willing seller.  And you are driving
17  damages of over a million dollars by assuming
18  Sweetwater and D'Pergo.  So there's no discount
19  price.  I am just trying to get you to use the
20  actual method for calculating damages.  And under
21  that method, why do you get to say D'Pergo would
22  have done this; Sweetwater would have needed that?
23  Isn't that all irrelevant under the actual way you

198

1   calculate this stuff?
2   A.   No, because you have to consider where
3   they got it from.  Not in the base damages, which I
4   didn't get from any of them.  But after you get that
5   base number and without applying a punitive measure,
6   you have to consider who the parties were.
7        If you and I both ran law firms and there
8   was a picture on your home page of your site that I
9   wanted to use on my law firm site, you would
10  consider that I am going to use it competitively
11  against you in quoting me a price to use that
12  photograph that you took and put on your website.
13  Q.   So in that scenario, why do you get to
14  assume that, once I know the price, I might just
15  say, "It's not worth it to me.  I will go find some
16  other picture"?
17  A.   Because in this instance, you used that --
18  who was on which site?  Now I forget.  But the image
19  was actually used and taken from that party; so you
20  have to assume that the transaction -- that the
21  licensor reasonably required a fee that contemplated
22  the scarcity of that image and the fact that they
23  are competitors.

199

1   Q.   So Sweetwater's use of the D'Pergo image
2   is what requires application of the scarcity and
3   competitive multipliers?
4   A.   The fact that they used their competitor's
5   image and did not go to a stock agency or -- well,
6   yeah, basically that, that they went -- that they
7   used their competitor's image and did not go to the
8   stock agency.  I can't use a royalty-free
9   comparable.  I have to use a rights-managed.  That
10  basically says -- when you do that, you are talking
11  about all photographers now, rights-managed, all
12  photographers.  Then beyond that, was it a
13  competitor or not?
14  Q.   Do you really think Sweetwater would have
15  paid $1.6 million for this image?
16       MR. SHORTELL:   Objection.
17  A.   What would -- well, I don't get to ask the
18  questions here.  So I have to say I think that it's
19  highly likely that Mr. Dapergolas could have
20  reasonably required a fee of that much or more to
21  make use of his image of his own products that he
22  took himself by a competitor.
23  Q.   (By Mr. Sackman)  But that's not the whole

200

1   piece; right?  Because you still need the willing
2   buyer.  So you really think Sweetwater -- even if
3   Mr. Dapergolas asked 1.6 million, you really think
4   Sweetwater would have paid it?
5        MR. SHORTELL:   Objection.
6   A.   I think that's the image that they wanted
7   and that they selected and that they used.  And I am
8   not in their heads as to what they would have or
9   would not have done.  But I know that they did it.
10  And I know that, from Mr. Dapergolas's standpoint,
11  you know, number one, he wouldn't have licensed it
12  to them.  But if forced to, he would have reasonably
13  required a very high number.
14  Q.   (By Mr. Sackman)  Doesn't that answer
15  demonstrate why you can't apply party-specific
16  multipliers to this analysis?  Because you have
17  said, "I don't know what Sweetwater would have paid,
18  and I don't think Mr. Dapergolas would have licensed
19  it."
20  A.   I think the opposite of that is entirely
21  inequitable and would -- why wouldn't everybody just
22  go steal each other's images and go -- go steal all
23  your competitor's images and put it on your site and

**Page 201**

1  then pay 37 cents because there's royalty-free
2  images available for 37 cents?  I don't think you
3  should under actual damages pay a penalty for the
4  fact that you infringed, but the actual damages
5  should approximate what the value of that license
6  would be and need to contemplate competitive use if
7  that occurred.
8       Q.    And it's your testimony, as you sit here
9  today, that the value of the license is nearly
10 $1.6 million?
11      A.    The value of the base license is whatever
12 that average was.  The fact that the image is scarce
13 is then calculated in.  And there's a range there.
14 And the range is much lower than what you are
15 talking about for scarcity.  It goes from -- I mean,
16 the range is stated in my report.
17            But then adding the fact that it was a
18 competitor brings the image up to a maximum of what
19 you are talking about, and that could change based
20 on the start dates and on whether this usage
21 actually occurred, which I understand is still under
22 discussion, whether certain parts of this usage
23 actually occurred, which I have assumed.  And so

**Page 202**

1  those numbers could change in my supplemental
2  report.
3       Q.    But your numbers -- I mean, I didn't make
4  these up; right?  I mean, if you go to page 26, your
5  high range is $1,583,450; correct?
6       A.    I think that's -- I am not looking at it
7  right now, but I think that's correct.
8             What page are you on, sir?
9       Q.    26.
10      A.    Thank you.
11            Yes.
12      Q.    And, of course, you wouldn't have put that
13 number in here if you didn't think it was
14 reasonable; right?
15      A.    What the reasonable -- what the seller
16 would have reasonably required, given the image
17 itself and given the fact that it was a competitor.
18 This is not -- I mean, I have shown the math.  And
19 if there's a -- you folks have a problem with the
20 math and your expert wants to suggest that I have
21 performed the calculations incorrectly, she can
22 attempt to do so.  I mean, she's taken a very odd
23 tact by saying it should be a royalty-free license

**Page 203**

1  when she knows that no photographer, no copyright
2  owner other than a stock agency offers royalty-free
3  rights or subscription rights.
4             MR. SACKMAN:  Would you read the question
5  back, please.
6             (Question read.)
7       A.    The number is based on my calculations.
8  So you are asking me a yes-or-no question.  You are
9  using "reasonable" outside of the context in which I
10 used it, which is what the seller could reasonably
11 require.  So you are using "reasonable" in a
12 different context.  My calculation is based on
13 taking a base number and -- for a generic image and
14 contemplating that there weren't a lot of neck
15 images available and then contemplating that it was
16 used by a competitor.
17      Q    (By Mr. Sackman)  Sir, is $1,583,450 a
18 reasonable license fee number in this case?
19      A.    Based on the scope of usage and on the
20 fact that the image was scarce and on the fact that
21 it was used competitively, those are the numbers.
22      Q.    That's not a yes or a no.  You have to
23 answer the question.  Yes, is it reasonable?  No, is

**Page 204**

1  it not?  You wrote the report, these are your
2  numbers.  So you can't just say, "Gee, those are the
3  numbers."  I want to know whether you think that
4  number was reasonable.
5             MR. SHORTELL:  Objection.
6       A.    I will restate my answer, that the actual
7  damages -- the total -- the range -- the totals in
8  the actual damages, the ranges here, are reasonable,
9  given the scope of the use and the circumstances of
10 the use, the competitive use, and the scarcity.
11      Q.    (By Mr. Sackman)  So the 1.58 million is
12 reasonable, given what you just said?
13            MR. SHORTELL:  Objection.
14      A.    You have got my answer on the record.
15      Q.    (By Mr. Sackman)  Your intention when you
16 testify in this case is to tell a New Hampshire jury
17 that they could reasonably award $1.58 million for a
18 license fee; correct?
19            MR. SHORTELL:  Objection.
20      A.    My intention would be to answer questions
21 from both sides as to how I came up with my
22 calculations and to present my totals for the ranges
23 of actual damages that would apply, given the nature

1  correct me and say, "No, I did answer it. I said
2  yes," or, "no. Then I explained," go ahead. But I
3  haven't heard an answer yet.
4      A.   I don't need to say yes or no to your
5  questions. Under your theory, Sweetwater could have
6  said no to $5 or $10 or $100 or $5,000. Sweetwater
7  could always say no because they could go to a stock
8  agency and get a guitar image, but they chose not to
9  do that. They chose to go to a competitor who
10 highly values his images and who gets damaged when
11 his competitors use his images.
12     Q.   Not Sweetwater, though; right? Willing
13 buyer?
14          MR. SHORTELL:   Objection.
15     A.   I don't know how many ways to answer it.
16 It's not a yes or no. Therefore I -- I am telling
17 you what I feel is equitable.
18     Q    (By Mr. Sackman)  We mentioned the
19 Leonard v. Stemtech International case; correct?
20     A.   Yes.
21     Q.   Okay. That case was decided by the United
22 States Court of Appeals for the Third Circuit;
23 correct?

1      Q.   It's from Jarvis from the Ninth Circuit,
2  Mackie v. Rieser from the Ninth Circuit, Leonard v.
3  Stemtech from the Third Circuit, and On Davis from
4  the Second Circuit.
5           MR. SACKMAN:   And I will just read into
6      the record -- I asked Mr. Sedlik to read from
7      Leonard v. Stemtech International. It's at
8      834 F.3d 376, and it was on page 390. And that
9      was the quotation that I asked him to read.
10          And the reason I don't want to provide
11     this is because it's got my own notes on it,
12     but I would be happy to supply a clean copy to
13     counsel afterwards. I didn't think we would
14     have so much trouble with what the standard
15     was, but there it is.
16     Q.   (By Mr. Sackman)  Now, going back to
17 Exhibit 2 and your table of usages that you referred
18 to here, sir -- so we're on Exhibit 2, and it's
19 Exhibit C to Exhibit 2.
20          We talked about the 12 years. Now, if you
21 go down to Usage No. 2, do you see that it says
22 10 years there?
23     A.   Yes.

1      A.   I believe so.
2      Q.   Okay. And then we also referenced that
3  On Davis case; right?
4      A.   On Davis v. Gap.
5      Q.   Yeah. Okay.
6           And so I happen to have here a copy of
7  Leonard v. Stemtech International. And I wasn't
8  planning to mark this as an exhibit, but it -- you
9  know, it has a description quoting from On Davis, as
10 it would happen, of how you consider fair market
11 value. And I just -- I wonder if you would be
12 willing to read what I have bracketed there, sir.
13 Can you read it for the record, please?
14     A.   Fair market value -- do you have to
15 introduce this as an exhibit for me to read it into
16 the record? I think you do.
17     Q.   No. Go ahead and read it, please.
18     A.   "Fair market value is often described as
19 'the reasonable licensing fee on which a willing
20 buyer and a willing seller would have agreed for the
21 use taken by the infringer.'"
22     Q.   Thank you.
23     A.   That's not from Jarvis?

1      Q.   Okay. Now, am I correct that Usage No. 2
2  refers to the point of sale, which is the presence
3  of electronic media in the retail store that are
4  capable of displaying the buying guide? If you need
5  to consult something, go ahead.
6      A.   No. I mean, I think that's a little bit
7  more broad than I would say. You know, "capable of
8  displaying" could be any display. I have seen for
9  the first time in Ms. Boughn's report that she's
10 claiming that the computers that were in the store
11 before the interactive kiosks were put in were just
12 computers that were on -- that were being sold by
13 Sweetwater and that customers in Sweetwater stores
14 would not actually use those computers to view
15 Sweetwater products for the purpose of consideration
16 of purchase of those products.
17     Q.   Well, they could; right? I mean, they had
18 access to the Internet.
19     A.   They could.
20     Q.   So that's what I am trying to get clear.
21 What's the -- this second usage, what in your own
22 words does it refer to?
23     A.   When you have an electronic display or a