UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

D'Pergo Custom Guitars, Inc.

    v.                                                Civil No. 17-cv-747-LM
                                                          Opinion No. 2021 DNH 111 P

Sweetwater Sound, Inc.

**O R D E R**

Plaintiff D'Pergo Custom Guitars, Inc. ("D'Pergo") brought suit against defendant Sweetwater Sound, Inc. ("Sweetwater"), alleging that Sweetwater's unauthorized use of one of D'Pergo's photographs violated the New Hampshire Consumer Protection Act ("the CPA"), RSA ch. 358-A.  The court held a bench trial on D'Pergo's CPA claim in June 2021.[1]  For the reasons discussed below, the court finds and rules that D'Pergo failed to prove that Sweetwater engaged in an unfair or deceptive act as required by the CPA.  See RSA 358-A:2.  This order details the court's findings of fact and rulings of law.  See Fed. R. Civ. P. 52(a).

---

[1] The CPA bench trial was conducted simultaneously with a jury trial.  The jury trial began on June 22 and the jury returned its verdict on June 30.  The only issue before the jury was the extent to which Sweetwater owed damages under the Copyright Act for infringing D'Pergo's copyright.  See doc. no. 139 (granting D'Pergo summary judgment on the question of infringement liability).  The jury awarded D'Pergo $74,360 in actual damages but nothing in infringing profits.  See doc. no. 258; see also 17 U.S.C. § 504.

## FINDINGS OF FACT

D'Pergo manufactures and sells high-end, custom electric guitars.  Unlike some other guitar manufacturers, D'Pergo manufactures nearly all its own parts and harvests many of the raw materials required for its guitars' construction.  D'Pergo relies on the meticulous nature of its guitars' construction to generate sales—the company does little advertising, preferring instead to sell directly to consumers through positive word-of-mouth reviews.  D'Pergo guitars generally sell for between $10,000 and $18,000.  In 2017, the company sold approximately twenty guitars for total revenues of around $250,000.

Sweetwater is a large music and audio equipment retailer.  In 2015, its revenues exceeded $430 million.  Although Sweetwater exclusively sold professional audio equipment for a time, it began offering electric guitars for sale in the early 2000s.  Unlike D'Pergo, Sweetwater does not manufacture its own guitars—it is a third-party retailer that sells guitars made by other companies.  Sweetwater focuses on selling established and well-recognized guitars from brands like Fender and Gibson.  It does not carry guitars made by small manufacturers like D'Pergo.

Both D'Pergo and Sweetwater operate their own websites.  In 2003, D'Pergo's owner, Stefan Dapergolas, took a photograph of eight unfinished guitar necks and headstocks ("the Photo") and posted it on D'Pergo's website.[2]  Dapergolas testified

---

[2] The neck is the part of the guitar that sits in the player's hand and that the player threads to play different chords.  The headstock is the portion of the guitar that is connected to the neck and sits above it.

that an electric guitar's neck is the instrument's most important aspect to guitar players. He further testified that guitar manufacturers use a unique, easily identifiable shape for their headstocks.

In the Photo, the necks are displayed lying face-up on a black surface. Seven necks are arranged in a semi-circle, and an additional neck lies horizontally just beneath the other seven. Many of the necks are made from different woods and are different colors. Neither the necks nor the headstocks bear the D'Pergo logo.

In 2004, Sweetwater copied the Photo from D'Pergo's website and began using it on a page of its own website called the "Electric Guitar Buying Guide" ("the Guide").[3] Although the Guide contained a hyperlink to "Shop for Electric Guitars" at the bottom of the page, its primary purpose was to inform aspiring guitar players of the different components of electric guitars and how those components affect the instrument's sound, quality, and playing style. The Photo appeared in a section of the Guide titled "Guitar necks explained," which is approximately halfway through the Guide. This section contains information on the common types of wood used in electric guitar necks, the three primary methods for attaching the neck to the body of the guitar, and three standard neck "profiles" or shapes.

The Photo was relatively small in comparison to the rest of the Guide. It took up approximately a third of the Guide's width and was not much bigger than a

---

[3] There was testimony at trial that Sweetwater's website contained between 100,000 and 500,000 unique pages. The Photo appeared on only a single page: the Guide.

thumbnail-sized image.  The image quality was low—the necks were blurry and it was difficult to tell whether anything was written on the headstocks, such as a logo.

The Photo remained on the Guide from 2004 until January 2016.  At trial, D'Pergo called two witnesses who testified to viewing the Photo on Sweetwater's website during this time: Jesse Lee Guanyu and Kamran Khan.

Guanyu first developed an interest in guitars in 2005, when he was around fifteen years old.  In researching guitars on the internet, he learned that D'Pergo made high-quality, handmade, custom guitars.  Guanyu testified that, when he later came upon Sweetwater's website and saw the Photo in the Guide, he "immediately" recognized the necks and headstocks in the Photo as being D'Pergo's.  Guanyu further testified that, although he frequently used Sweetwater's website to obtain reliable information about electric guitars, the Photo's presence on Sweetwater's website caused him to completely lose interest in purchasing a D'Pergo guitar.  Even though he knew Sweetwater did not sell D'Pergo guitars, Guanyu testified that the Photo caused him to infer Sweetwater and D'Pergo had a business affiliation.

In 2013, while at a friend's house, Guanyu happened upon a D'Pergo guitar.  He testified that, after playing the instrument, he was "haunted" by the feel of its neck for weeks.  Since that time, Guanyu has spent close to $200,000 on D'Pergo guitars.  And, although Guanyu has seemingly had a personal relationship with Dapergolas since around the time he began purchasing his guitars in 2013, he did not tell Dapergolas until 2018—after this litigation began—that the Photo's

presence on Sweetwater's website dissuaded him from buying D'Pergo guitars for several years.

Guanyu's testimony was not credible. First, Guanyu—who testified remotely via videoconferencing software—was clearly reading from notes or a script during his direct examination. Rather than looking directly into the camera when he answered questions, he consistently fixed his gaze on the left portion of his computer screen each time he began his answer. Second, Guanyu testified that he operates a small business purchasing and reselling boutique guitars, that he struggles to make a profit on guitars other than D'Pergo's, and that he resells D'Pergo's guitars with the company's blessing. His resale operation depends on remaining in D'Pergo's good graces, and the fact that he did not tell Dapergolas about his viewing of the Photo until after this lawsuit began strongly suggests his testimony was motivated by a desire to please Dapergolas. Third, Guanyu's testimony was internally inconsistent in certain respects. For example, given that Guanyu knew Sweetwater did not sell D'Pergo guitars, necks, or headstocks, his testimony that he was confused as to whether D'Pergo had a business affiliation with Sweetwater was not credible.

Like Guanyu, Kamran Khan had a close relationship with Dapergolas at the time of his trial testimony. Khan testified that he first became interested in guitars as a teenager in the 1970s. Since that time, he has owned over 150 guitars. Khan testified that he has purchased guitars from virtually every boutique guitar

manufacturer in the U.S. and Europe.  He constantly scours the internet—including Sweetwater's website—for information about high-end guitars.

Khan first learned about D'Pergo in 2008 while researching guitars online.  Khan said that D'Pergo had an overall reputation for excellence among the online guitar community.  However, Khan testified that he did not purchase a D'Pergo for several years largely because, in 2009, he saw the Photo on Sweetwater's website.  He said that viewing the Photo on the Guide made him think that Sweetwater was selling D'Pergo guitars and necks, and that this supposed business arrangement between D'Pergo and a big-box retailer like Sweetwater caused him to question the quality of D'Pergo's guitars.

Like Guanyu, Khan contacted Dapergolas to purchase a guitar after happening upon a used D'Pergo in 2014.  Khan currently owns three D'Pergo guitars and has commissioned a fourth.  Since 2014, Khan has spent $80,000 on D'Pergo guitars.  He has also stayed overnight at Dapergolas's New Hampshire home.

Khan's testimony—that the Photo's presence on Sweetwater's website made him think Sweetwater was selling D'Pergo necks—was not believable.  Khan testified that he conducts extensive online research on guitars and that he has purchased over 150 guitars.  He also testified to regularly viewing Sweetwater's website.  Given Khan's voracious appetite for online information about guitars, the notion that he would simply assume Sweetwater was selling D'Pergo necks without reviewing Sweetwater's website to confirm or deny that assumption is implausible.

Moreover, Khan is a repeat and high-spending D'Pergo customer who has a clear motivation to offer favorable testimony. He also has a personal relationship with Dapergolas, the company's owner.

In addition to Guanyu and Khan, D'Pergo called Julien Kasper to testify at trial. Like Guanyu and Khan, Kasper had a personal relationship with Dapergolas. Kasper is a friend of Dapergolas and a professor at Berklee College of Music. He first met Dapergolas in 2001 at a music festival in New Hampshire, where Dapergolas asked him to test and give feedback on D'Pergo's guitars. Kasper has tested, analyzed, and given extensive feedback on several D'Pergo guitars over the years. In exchange, Dapergolas has given him at least one guitar valued at approximately $12,000. One of D'Pergo's guitar models is named after Kasper – the "JK Classic."

In December 2014, Kasper was playing a D'Pergo guitar at a performance. Kasper testified that an audience member approached him while taking a break and asked if his guitar was a "parts" guitar—i.e., a guitar whose parts are sourced from various manufacturers and which are then put together by an assembler or an individual customer. Kasper explained that he was not playing a parts guitar, but a D'Pergo. Kasper claimed that the audience member told Kasper that he assumed Kasper's guitar was a parts guitar because the audience member had seen a photo of the same neck in an unfinished state on Sweetwater's website.[4]

---

[4] Without objection from Sweetwater, D'Pergo twice elicited testimony from Kasper relaying what the audience member had told him.

Kasper testified that he did not believe that Sweetwater would have had a photograph of D'Pergo's guitar necks on its website.  A few weeks later, in January 2015, Kasper visited Dapergolas in New Hampshire.  While having lunch together, Kasper told Dapergolas what the audience member said to him.  Kasper and Dapergolas then looked up Sweetwater's website and discovered the Photo on the Guide.

Although Dapergolas claimed to believe that the Photo's presence on Sweetwater's website was the "kiss of death" for D'Pergo, he did not immediately request that Sweetwater remove the Photo.  Instead, Dapergolas consulted multiple attorneys.  He also engaged a forensic image analyst, Jeffrey Sedlik, to verify that the Photo appearing on the Guide was the same photo Dapergolas took in 2003 and posted to D'Pergo's website.  Dapergolas testified that, although he immediately knew the Photo was his, he did not want to contact Sweetwater until he could prove that the Photo was his.[5]  Sedlik completed his report approximately eleven months later, in December 2015.  Sedlik concluded that the Photo on the Guide and D'Pergo's photo were, indeed, the same photograph.

In January 2016—one year after Dapergolas saw his photo on Sweetwater's website—D'Pergo contacted Sweetwater and demanded that Sweetwater remove the Photo from the Guide.  That same date, Sweetwater investigated D'Pergo's

---

[5] D'Pergo also engaged Sedlik to act as its damages expert.  Sedlik testified at trial that Sweetwater's use of the Photo caused D'Pergo over a million dollars in damages.

claim and discovered that the Photo was D'Pergo's; Sweetwater immediately removed the photo from its website. The company's investigation revealed that a former employee had placed the Photo on the Guide. Sweetwater was unable to determine the precise identity of the employee, however, or the reason he or she posted the Photo to the Guide.

Over the next approximately two years, D'Pergo continued to work with Sedlik as well as an additional damages expert, Michael Einhorn.[6] D'Pergo ultimately filed suit in December 2017.

## LEGAL STANDARD

Counts II and III of D'Pergo's amended complaint allege that Sweetwater's use of the Photo violated the CPA.[7] The CPA provides that it is unlawful to use an "unfair method of competition or . . . unfair or deceptive act or practice in the conduct of any trade or commerce within this state." RSA 358-A:2. The statute sets forth a non-exhaustive list of seventeen unfair methods of competition and deceptive acts or practices. See RSA 358-A:2, I-XVII. If the challenged conduct does not fall within one of the violations specifically enumerated in RSA 358-A:2, it is nonetheless actionable if it satisfies the "rascality" test. State v. Priceline.com,

---

[6] At trial, D'Pergo sought to disgorge Sweetwater of over $8 million in profits on the basis of Einhorn's testimony.

[7] Although the counts purport to allege multiple CPA claims, at most they allege that Sweetwater's use of the Photo constituted a single CPA violation under multiple theories.

Inc., 172 N.H. 28, 39 (2019) (stating the rascality test). In addition, "a claim under RSA 358-A:2 must be for deceptive or unfair practices 'requiring a degree of knowledge or intent.'" Johnson v. Cap. Offset Co. Inc., No. 11-CV-459-JD, 2013 WL 5406613, at *6 (D.N.H. Sept. 25, 2013) (quoting Kelton v. Hollis Ranch, LLC, 155 N.H. 666, 668 (2007)).

"Whether a party has committed an unfair or deceptive act, within the meaning of the [CPA], is a question of fact." CRMC Bethlehem, LLC v. N. Country Env't Servs., Inc., Civ. No. 1:09-cv-344-JL, 2010 WL 3002025, at *3 (D.N.H. July 29, 2010) (emphasis omitted) (quoting Chroniak v. Golden Inv. Corp., 983 F.2d 1140, 1146 (1st Cir. 1993)). The plaintiff has the burden of proving its CPA claim by a preponderance of the evidence. See Moulton v. Bane, Civ. No. 14-cv-265-JD, 2016 WL 1091093, at *11 (D.N.H. Mar. 21, 2016).

## RULINGS OF LAW

In its post-trial memorandum, D'Pergo argues only that Sweetwater violated RSA 358-A:2, V. See doc. no. 261 at 4-5, 13-14. D'Pergo does not argue that Sweetwater's conduct is actionable under any other subparagraph of RSA 358-A:2 or the rascality test.[8] Accordingly, the court limits its analysis to RSA 358-A:2, V.

---

[8] Although D'Pergo referenced additional provisions of RSA 358-A:2 in prior memoranda and proposed findings and rulings, see doc. nos. 168 and 169 (citing subparagraphs II, III, and V), the arguments for CPA liability advanced in those filings are materially identical to the arguments advanced in its most recent memorandum, see doc. no. 261 (citing only subparagraph V). The court construes

RSA 358-A:2, V provides that it is an unfair or deceptive business practice to represent "that a person has a sponsorship, approval, status, affiliation, or connection that such person does not have." D'Pergo contends that Sweetwater's use of the Photo amounted to a representation that Sweetwater was affiliated with D'Pergo. See id.; RSA 358-A:1, I (defining "person" to include "corporations"). D'Pergo argues that Lee's and Khan's testimony—that they thought Sweetwater and D'Pergo had a business affiliation after viewing the Photo on the Guide—demonstrates that Sweetwater falsely claimed an affiliation with D'Pergo.

The court disagrees. As noted supra, while both Guanyu and Khan testified to believing that Sweetwater and D'Pergo had a business affiliation after viewing the Photo on the Guide, their testimony was internally inconsistent and self-motivated. For the reasons stated in its findings of fact, the court does not credit Guanyu's and Khan's testimony that, after viewing the Photo on the Guide, they believed D'Pergo and Sweetwater had a business connection.

While D'Pergo notes that a plaintiff is not required to demonstrate actual confusion amongst consumers in order to prevail under the CPA, see RSA 358-A:11, D'Pergo is nonetheless the party with the burden of proof, see Moulton, 2016 WL 1091093, at *11. D'Pergo argues that these two witnesses experienced actual confusion as to whether D'Pergo and Sweetwater had an affiliation after viewing the Photo and that their confusion demonstrates that Sweetwater's conduct ran

---

this discrepancy as indicating D'Pergo's intent to focus the court's attention exclusively on RSA 358-A:2, V.

11

afoul of RSA 358-A:2, V.  Given that the court does not credit Guanyu's and Khan's testimony that they experienced any such confusion, D'Pergo's argument necessarily fails.

D'Pergo points to no other evidence in support of its contention that Sweetwater's use of the Photo violated RSA 358-A:2, V.  And, from the court's independent review of the trial evidence, there is little else tending to show that Sweetwater's use of the Photo violated that subparagraph.  The necks and headstocks depicted in the Photo did not bear D'Pergo's logo; the only possible D'Pergo identifier in the Photo was the shape of the headstocks.  While several of D'Pergo's witnesses testified that a person with knowledge of guitars can discern a guitar's brand merely by the shape of its headstock, the court concludes from the evidence at trial that an average consumer would not be able to determine that the Photo depicted D'Pergo guitars.  See Mulligan v. Choice Mortg. Corp. USA, No. CIV. 96-596-B, 1998 WL 544431, at *11 (D.N.H. Aug. 11, 1998) ("New Hampshire courts use an objective standard to determine whether acts or practices are 'unfair or deceptive' in violation of the CPA."); see also Fat Bullies Farm, LLC v. Devenport, 170 N.H. 17, 26-27 (2017) (same). While cross-examining Dapergolas, Sweetwater positioned a non-D'Pergo guitar side-by-side with one of D'Pergo's as a demonstrative aid.  The guitars' headstocks had substantially similar shapes, curvatures, and size, among other characteristics.  Given these substantial similarities, the court is not persuaded that an average consumer would discern from the Photo (especially as it appeared on the Guide—blurry and small) that it

depicted D'Pergo guitar necks and headstocks as opposed to another manufacturer's.

There was also testimony from Kasper relaying out-of-court statements from an unnamed patron at one of Kasper's performances.  The patron told Kasper that he saw the Photo on Sweetwater's website and asked whether Kasper's D'Pergo guitar was a "parts" guitar.  While Kasper's testimony moves the ball slightly in D'Pergo's favor, it fails to demonstrate—standing alone or in combination with the rest of the evidence—that Sweetwater's use of the Photo constituted an unfair or deceptive act under the CPA.  The court places little evidentiary value on out-of-court statements from unidentified declarants.  What is more, the person relaying this unreliable evidence, Kasper, had a close relationship with Dapergolas and was biased in his favor.  This evidence fails to demonstrate by a preponderance of the evidence that Sweetwater violated the CPA.

In summary, D'Pergo failed to prove that consumers would have understood Sweetwater's use of the Photo to assert an affiliation between Sweetwater and D'Pergo.  Even if D'Pergo had so proven, however, D'Pergo failed to prove that Sweetwater acted with the intent required for a CPA violation.

"In order to [prove] a claim under RSA 358-A:2, V . . . , a plaintiff must [prove] that the defendant made a representation, with actual knowledge of its falsity or reckless disregard for its truth, with the intent to induce [consumers] to enter into a transaction." Androscoggin Valley Reg'l Refuse Disposal Dist. v. R.H. White Constr. Co., Inc., Civ. No. 15-cv-434-LM, 2017 WL 1906612, at *3 (D.N.H.

13

May 8, 2017) (quotation omitted); accord Beer v. Bennett, 160 N.H. 166, 169-71 (2010) (concluding there was sufficient evidence that the defendant violated RSA 358-A:2, V, where the defendant knowingly made unsubstantiated representations with the intent of inducing plaintiff to make a purchase).  Here, even assuming that an average consumer would have understood Sweetwater to be asserting an affiliation with D'Pergo by using the Photo, D'Pergo failed to prove that Sweetwater used the Photo "with the intention to mislead customers" as to such an affiliation. Gallagher v. Funeral Source One Supply & Equip. Co., Inc., No. 14-cv-115-PB, 2015 WL 6738733, at *9 (D.N.H. Nov. 4, 2015); see also, e.g., Brace v. Rite-Aid Corp., No. 10-cv-290-LM, 2011 WL 635299, at *5 (D.N.H. Feb. 14, 2011) (plaintiff failed to state a CPA claim given lack of allegation that defendant had the intent to mislead customers).

  Having carefully weighed the evidence in this case, I find that Sweetwater's use of the Photo was largely inadvertent.  A former employee posted the Photo to the Guide in 2004.  Apart from that employee, seemingly no one at the company realized that the Photo was D'Pergo's until D'Pergo contacted Sweetwater in January 2016.  Sweetwater then removed the Photo from the Guide immediately after D'Pergo asked it to.  See Gallagher, 2015 WL 6738733, at *9 (insufficient evidence of intent to mislead customers where defendant's alleged copyright infringement occurred prior to receiving notice of infringement and defendant removed allegedly infringing photograph as soon as plaintiff filed suit).  The reasonable inference from the evidence at trial is that a Sweetwater employee in

2004 wanted a photograph of guitar necks for the Guide and that that Sweetwater employee copied the Photo from D'Pergo's website to put on the Guide. For the next twelve years, no one at Sweetwater noticed that the Photo was not properly Sweetwater's. At most, D'Pergo proved that Sweetwater knew or should have known that the Photo belonged to D'Pergo. However, such proof does not show that Sweetwater used the Photo with the requisite intent to deceive consumers. See Androscoggin Valley, 2017 WL 1906612, at *3; Gallagher, 2015 WL 6738733, at *9.

For all of these reasons, the court concludes that D'Pergo did not come close to proving that Sweetwater violated the CPA.[9] The Photo appeared on a single page of a website containing hundreds of thousands of pages. Sweetwater does not sell and has never sold D'Pergo products. D'Pergo wants the court to believe that a consumer, aware of the fact that he could not purchase D'Pergo guitars on Sweetwater's website, would view a tiny, blurry photograph of guitar necks that do not bear D'Pergo's logo and conclude (A) that the guitar necks were D'Pergo's and (B) that D'Pergo and Sweetwater had some nebulous affiliation. D'Pergo's

---

[9] Parenthetically, although D'Pergo has not argued that Sweetwater's conduct ran afoul of the CPA's rascality test, the court notes that Sweetwater's near-accidental use of the Photo would not "raise an eyebrow of someone inured to the rough and tumble of the world of commerce." Priceline, 172 N.H. at 39. Indeed, one of D'Pergo's own witnesses, Ted Rasch, operated a music retail website. D'Pergo offered Rasch as a witness familiar with the guitar and music industry. Rasch candidly testified that he routinely took content for his website from others. Indeed, Rasch didn't bat an eye when confronted with evidence on cross-examination that he had lifted written copy from Sweetwater's website wholesale.

argument fails. Sweetwater did not intend to assert such an affiliation and no reasonable person would have inferred one.

## CONCLUSION

The court finds and rules that D'Pergo failed to prove that Sweetwater's use of the Photo violated the CPA. Sweetwater's pending oral motion to dismiss made on June 24, 2021, is denied as moot. The clerk of court is directed to enter judgment in favor of Sweetwater on Counts II and III of D'Pergo's amended complaint (doc. no. 44).

SO ORDERED.

_____
Landya McCafferty
United States District Judge

July 19, 2021

cc: Counsel of Record.